UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBORAH LYNN CAGNEY, | Case No. 13-CV-1766-BAS (JMA) |
| Plaintiff, | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DOC. NO. 14] AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT [DOC. NO. 15]** |
| v. | |
| CAROLYN W. COLVIN, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Deborah Lynn Cagney ("Plaintiff") seeks judicial review of Defendant Social Security Commissioner Carolyn W. Colvin's ("Defendant") determination that she is not entitled to disability insurance benefits.  The parties have filed cross-motions for summary judgment.  For the reasons set forth below, the Court recommends that Plaintiff's motion for summary judgment be **DENIED** and that Defendant's cross-motion for summary judgment be **GRANTED**.

**I. BACKGROUND**

Plaintiff, a resident of Alpine, California, was born in 1971.  (Compl. at 1; Admin. R. at 48.)  She completed twelfth grade and worked as a waitress and manager at Denny's Restaurant from 1988 to 2009.  (Id. at

1  48, 162.)  In an application for disability insurance benefits filed in May

2  2010, Plaintiff alleged a disability onset date of November 4, 2009 due to

3  Guillain-Barre Syndrome.  (Id. at 140-44, 161.)[1]  Plaintiff's application for

4  benefits was denied initially on September 9, 2010 and upon

5  reconsideration on March 3, 2011.  (Id. at 73-77, 82-87.)  On April 28,

6  2011, Plaintiff requested an administrative hearing.  (Id. at 89-90.)  A

7  hearing was conducted in San Diego, California on April 30, 2012 by

8  Administrative Law Judge ("ALJ") Larry B. Parker, who determined on May

9  15, 2012 that Plaintiff was not disabled.  (Id. at 25-37.)  Plaintiff requested a

10 review of the ALJ's decision; the Appeals Council for the Social Security

11 Administration ("SSA") denied Plaintiff's request for review on June 3,

12 2013.  (Id. at 1-4.)  Plaintiff then commenced this action pursuant to 42

13 U.S.C. § 405(g).

14 **II.  MEDICAL EVIDENCE**

15      On November 8, 2009, Plaintiff was seen at Kaiser Permanente

16 ("Kaiser") with complaints of flu-like symptoms.  (Id. at 302-03.)  She was

17 seen by Dr. Nancy Folks at Kaiser five days later, on November 13, 2009,

18 due to fatigue, weakness, and cough, which was ongoing for one week.

19 (Id. at 294-301.)  Plaintiff saw Dr. Folks again later in November and

20 complained of generalized body pains and searing pains from her major

21 joints into her thighs, feet, hands, and elbows.  (Id. at 286-89.)  Dr. Folks

22 determined that Plaintiff had a decrease in proprioception while standing

23 with her eyes closed.  (Id. at 288.)  The primary diagnosis was myofascial

24

25

26      [1]Guillain-Barre Syndrome is a rare disorder in which the body's immune
27 system attacks the patient's nerves.  Weakness and tingling in the extremities
   are usually the first symptoms.  See
28 http://www.mayoclinic.org/diseases-conditions/guillain-barre-syndrome/basics/de
   finition/con-20025832 (as visited Jan. 6, 2015).

pain syndrome, vitamin D deficiency, and Raynaud's Syndrome.  (Id.)[2]  Dr. Folks gave Plaintiff a vitamin B12 injection, vitamin D supplements, and scheduled a follow-up in twelve weeks.  (Id.)

Plaintiff's symptoms continued, so on December 2, 2009, she consulted with Dr. William Devor, a neurologist, for evaluation of myalgias (muscle pains) and intermittent weakness following her flu-like illness.  (Id. at 280-85.)  Plaintiff reported intermittent tingling in her extremities, myalgias involving her thigh and calf muscles, and pain in her finger joints and knees.  (Id. at 281.)  Dr. Devor's motor exam suggested distal weakness; however, the degree of Plaintiff's effort was uncertain.  (Id. at 282.)  A nerve conduction study showed no evidence of a significant inflammatory polyneuritis, e.g., Guillain-Barre Syndrome.  (Id. at 283-84.)  However, Dr. Devor could not rule out a very mild form of post-viral inflammatory polyneuritis.  (Id. at 284.)  Dr. Devor reassured Plaintiff that she did not have a serious form of post-viral polyneuritits, and informed her that the symptoms would resolve over a period of weeks.  (Id.)  Plaintiff was advised to rest and to take an NSAID[3], such as naproxen, for pain.  (Id.)

Plaintiff saw Dr. Folks again on December 14, 2009, complaining of pain in both legs and arms, from her thighs to her calves and from her upper arms to her forearms.  (Id. at 276.)  Plaintiff reported contraction-like waves of pain with even limited activity.  (Id.)  She had been out of work since early November and sought a note for extended time off for disability as she felt unable to return to work.  (Id.)  Plaintiff stated that she felt like

[2]Raynaud's disease causes some areas of the body, such as fingers and toes, to feel numb and cold in response to cold temperatures or stress.  See http://www.mayoclinic.org/diseases-conditions/raynauds-disease/basics/definitio n/con-20022916 (as visited Jan. 6, 2015).

[3]Non-steroidal anti-inflammatory drug.

she was losing balance due to a loss of coordination, and was also not sleeping well due to muscle pain.  (Id. at 277.)  Dr. Folks observed that Plaintiff was very thin, and noted that her exam was consistent with a patient not trying to prove strength or tone.  (Id. at 278.)  Dr. Folks recommended an MRI and a follow-up appointment with Dr. Devor.

Plaintiff had a follow-up appointment with Dr. Devor on January 4, 2010.  (Id. at 271-75.)  Plaintiff reported no improvement in her symptoms since her last visit and rated the pain at a 7 out of 10.  (Id. at 272.)   Dr. Devor observed that Plaintiff's reflexes had become more diminished since her last visit, supporting a diagnosis of Guillain-Barre Syndrome, mild in degree, and compatible with Plaintiff's symptoms and post-viral onset.  (Id. at 273.)  Dr. Devor recommended a five-day course of intravenous gamma globulin therapy and advised Plaintiff to remain off work until January 25, 2010. (Id.)

Plaintiff underwent this therapy from January 7 to 10, 2010.  (Id. at 322-40.)  Plaintiff tolerated the treatment well at first, but after the third day developed a headache and a rash, both of which resolved shortly thereafter, but which resulted in the therapy ending after four days instead of five.  (Id. at 324, 327-28.)  Eight days after treatment, Plaintiff followed up with Dr. Devor and reported no improvement in her symptoms.  (Id. at 265.) However, Dr. Devor determined her reflexes were normal and symmetrical.  (Id. at 269-70.)  Dr. Devor maintained his diagnosis of a mild case of Guillain-Barre Syndrome, opined that Plaintiff's symptoms would improve gradually over time, and recommended no other treatment in view of her relatively mild deficits.  (Id. at 270.)

In January 2010, Plaintiff had a brain MRI without and with contrast, which was unremarkable.  (Id. at 266, 341-42.)  Plaintiff visited Dr. Devor in February 2010, after the MRI, and reported ongoing symptoms.  (Id. at

13cv1766

264-68.)  Dr. Devor noted that Plaintiff's Guillain-Barre Syndrome was "very mild" and "not confirmed by nerve conduction studies," and prescribed a ten-day course of Prednisone.  (Id. at 266.)  Plaintiff saw Dr. Devor again later that month and he determined that her pattern of reflexes was continuing to improve.  (Id. at 261-64.)  Dr. Devor advised Plaintiff to gradually increase her activity level and opined that she could return to work on March 15, 2010.  (Id. at 263.)  Dr. Devor saw Plaintiff again in March 2010.  (Id. at 247-51, 254-57.)  He noted that while Plaintiff's Guillain-Barre Syndrome was mild in degree, it was nonetheless disabling, and extended her time off work to June 7, 2010.  (Id. at 256.)

In April 2010, Plaintiff, who had a history of anxiety and depression (see, e.g., id. at 660, 664), was seen by Dr. Annette Pozos in the psychiatric department at Kaiser.  (Id. at 633-35.)  Plaintiff reported that her mood had been "ok" during her Guillain-Barre issues, and that she was slowly getting better.  (Id. at 633.)  She had been told her strength in her legs might never come back completely, so she was concerned that her job at Denny's, which required ten hours per day on her feet, would not be something she could do.  (Id.)  She had been looking online for other job possibilities.  (Id. at 634.)  Dr. Pozos continued Plaintiff's prescriptions of Zoloft 100mg daily and Ativan 1mg as needed.  (Id.)

In May 2010, Plaintiff reported to Dr. Devor that she had no improvement in her condition.  (Id. at 248-49.)  She stated she had been attempting to walk around her neighborhood on a daily basis, but after one block had to stop and rest.  (Id. at 248.)  Dr. Devor observed that Plaintiff's weakness appeared worse and her pattern of reflexes had changed with a loss of both biceps reflexes.  (Id. at 250.)  He noted that she has been let go from her job and suggested that she apply for Social Security benefits. (Id. at 248, 250.)  Dr. Devor opined that Plaintiff's clinical picture was

evolving to a chronic inflammatory polyneuritis and recommended a repeat of the nerve conduction study.  (Id. at 250.)

In June 2010, Dr. Devor performed another nerve conduction study, which showed the right peroneal sensory and motor responses were absent.  (Id. at 245.)  The findings were indicative of an asymmetrical but diffuse neuropathic process compatible with Dr. Devor's diagnosis of inflammatory polyneuritis.  (Id. at 245.)  Dr. Devor discussed the possibility of a repeat course of intravenous gamma globulin therapy, but since the previous treatment was unsuccessful and resulted in significant side effects, Plaintiff declined the treatment.  (Id. at 246.)

Plaintiff saw Dr. Devor again in July 2010, complaining of right lower back pain that radiated down her lower right extremity.  (Id. at 237-40.)  Dr. Devor's assessment was a strain of the lumbar region.  (Id.)  Plaintiff continued to report no improvement in her Guillain-Barre Syndrome-related symptoms.  (Id. at 238.)  Dr. Devor noted that treatment options were limited as she had failed intravenous gamma globulin treatment.  (Id. at 240.)  Nonetheless, Dr. Devor was hopeful that Plaintiff's symptoms would improve with time.  (Id.)

Plaintiff followed up with Dr. Devor in September 2010, and reported that her symptoms had not appreciably changed.  (Id. at 424.)  She stated that in a typical day she could perform some activities of daily living, but estimated she rested 7-8 hours per day.  (Id.)  Plaintiff reported intermittent pain in both legs averaging an 8 on a scale of 10, as well as a tingling sensation in both legs and, to a lesser degree, in her hands and arms.  (Id.)  Dr. Devor noted that Plaintiff had lost a couple of pounds since her previous visit, and now complained of bifrontal headaches occurring two to three times per week.  (Id. at 426.)  The only option for treatment was another round of gamma globulin treatment, to which Plaintiff agreed.  (Id.)

13cv1766

Dr. Devor also discussed the possibility of a cerebral spinal fluid exam to confirm the diagnosis of Guillain-Barre Syndrome.  (Id.)

In September 2010, Plaintiff had gamma globulin infusions over the course of four days, five hours per day.  (Id. at 402-23.)  After the third day of treatment, Plaintiff again reported having treatment-related headaches.  (Id. at 396, 402.)  The following month, Plaintiff reported that she had received absolutely no benefit from the treatment.  (Id. at 396.)

Plaintiff visited Dr. Folks on October 26, 2010 due to abdominal pain.  (Id. at 384-96.)  Dr. Folks diagnosed irritable bowel syndrome ("IBS"), referred Plaintiff for non-fasting labs, gave Plaintiff a vitamin B12 injection, and instructed Plaintiff to follow-up with gastroenterology.  (Id. at 385.)  Three days later, on October 29, 2010, Plaintiff saw Dr. Richard Alan Brower for consultation and evaluation of her gastrointestinal distress.  (Id. at 378-83.)  Plaintiff reported a two year history of periodic lower abdominal cramping and diarrhea, with her symptoms increasing in frequency and severity over time.  (Id. at 378.)  Dr. Brower confirmed the diagnosis, prescribed Plaintiff a trial dosage of Levsin, and provided Plaintiff with IBS literature and counseling.  (Id. at 380.)

Plaintiff also followed up in October 2010 with Dr. Pozos regarding her psychiatric issues.  (Id. at 628-30.)  Plaintiff reported feeling more depressed because she had been told that her Guillain-Barre was permanent, her weakness had gotten worse, and Social Security had denied her claim.  (Id. at 628.)  Dr. Pozos increased Plaintiff's Zoloft dosage and referred her to a therapist.  (Id. at 629.)   Plaintiff reported in December 2010 that the increase in Zoloft had helped and that she was comfortable with the new dosage.  (Id. at 623.)

In November 2010, Plaintiff underwent home overnight oximetry recommended by Dr. Devor due to breathing difficulties while sleeping.  (Id.

13cv1766

1  at 368-71.)  The study was abnormal as Plaintiff exhibited an unusual

2  downward ramp of desaturation suggesting nocturnal hypoventilation.  (Id.

3  at 371.)  However, there were concerns regarding the technical quality of

4  the study.  (Id.)  Consequently, Dr. Devor recommended that a repeat

5  study be performed to verify the findings.  (Id.)

6      Due to these results, Plaintiff was seen in January 2011 by Karen

7  Marie Ziolo, D.O., to be evaluated for intrinsic lung disease.  (Id. at 721-29.)

8  Plaintiff reported that she had moved to a new home in Alpine in the past

9  year and had not experienced symptoms the prior year.  (Id. at 721.)

10 Plaintiff's symptoms had started two months before, approximately at the

11 time she started heating her home during the winter.  (Id.)  However,

12 Plaintiff reported that her heating ducts were cleaned just prior to the winter

13 months.  (Id.)  Upon reviewing Plaintiff's prior chest CT scans, Dr. Ziolo

14 determined Plaintiff's history of asthma and smoking to be the likely

15 underlying causes of her breathing difficulties, and scheduled a pulmonary

16 function test and a bike study.  (Id. at 723.)  Dr. Ziolo also prescribed an

17 inhaler regimen to assist with breathing.  (Id.)

18     Plaintiff had both a pulmonary function test and a bike test in

19 February 2011.  (Id. at 736-38, 740-41, 794.)  According to the

20 interpretation of the pulmonary function test by Dr. Kevin M. Murray,

21 Plaintiff had a mild obstructive lung defect.  (Id. at 812.)  On the basis of the

22 findings, Dr. Murray determined that more detailed pulmonary testing would

23 be useful.  (Id.)  During the bike test, Plaintiff stopped prior to completion

24 due to burning pain and fatigue.  (Id. at 794.)  Nonetheless, Dr. Iwona A.

25 Trybus examined the bike test results and determined there was no

26 desaturation with exercise, nor were there ventilatory or cardiovascular

27 limitations due to exercise.  (Id.)

28     During an appointment in January 2011, Dr. Devor advised Plaintiff

1   that she had exhausted her treatment options for Guillain-Barre Syndrome.
2   (Id. at 733.)  In March, Plaintiff and Dr. Devor exchanged several emails
3   regarding her ongoing symptoms.  (Id. at 746-55.)  Plaintiff reported that
4   stress due to child support and child custody issues (she is a single mother
5   of three school-age children) had worsened her symptoms, and that she
6   was experiencing severe muscle cramping, worsening as the day
7   progressed.  (Id. at 746, 748.)  Dr. Devor recommended that Plaintiff try
8   drinking tonic water, but it failed to provide relief.  (Id. at 747, 751.)  Plaintiff
9   saw Dr. Devor in March regarding the cramping.  (Id. at 757-59.)  Dr. Devor
10  noted that cramping can be a difficult-to-treat, late stage complication of
11  Guillain-Barre Syndrome.  (Id. at 759.)  For additional pain treatment, Dr.
12  Devor prescribed Gabapentin (Neurontin) and suggested she also try a
13  calcium magnesium supplement.  (Id.)  He also opined on March 25, 2011
14  that Plaintiff remained disabled from gainful employment.  (Id. at 793.)

15      In April 2011, Plaintiff saw Dr. Ziolo for a follow up.  (Id. at 826-30.)
16  Plaintiff reported her nocturnal breathing difficulties were improved with the
17  use of a Symbicort inhaler.  (Id. at 827.)  Consequently, Dr. Ziolo
18  recommended Plaintiff continue to use the inhaler and strongly advised
19  Plaintiff to stop smoking.  (Id. at 828.)

20      Plaintiff visited Dr. Devor in May and August of 2011.  (Id. at 769-73,
21  840-45.)  Dr. Devor noted that Plaintiff had no improvement in symptoms,
22  that Plaintiff's reflexes continued to suggest a mild form of Guillain-Barre
23  Syndrome, and that her symptoms continued to be disabling.  (Id. at 697,
24  771, 843.)  On August 22, 2011, Dr. Devor completed a form indicating that
25  Plaintiff was limited to working 2 hours per day, standing 15 minutes at a
26  time, sitting 2 hours at a time, lifting 5 pounds on an occasional basis, and
27  could perform no lifting on a frequent basis.  (Id. at 697.)  He stated further:
28  "Symptoms have not improved since the onset in November 2010.

Treatment interventions including intravenous gamma globulin have been unsuccessful.  She remains disabled from gainful employment." (Id.)

On September 21, 2011, at the request of the Social Security Administration, Plaintiff received a neurological evaluation from Dr. Kenneth Stover of Seagate Medical Group.  (Id. at 706-17.)  Dr. Stover determined that Plaintiff's signs and symptoms were consistent with Guillain-Barre Syndrome.  (Id. at 709.)  He found Plaintiff was functionally limited to standing and walking 6 out of 8 hours per day with an appropriate rest period on level ground, lifting and carrying limited to 25 pounds occasionally and 10 pounds frequently, with no limitations as to sitting, pushing, or pulling.  (Id. at 709.)

In April 2012, Dr. Devor referred Plaintiff for physical therapy and occupational therapy.  (Id. at 898.)  In addition, he wrote a letter on Plaintiff's behalf recommending that she be awarded Social Security benefits.  (Id. at 718.)  Plaintiff had an initial physical therapy evaluation in May 2012, but had not returned as of June 2012.  (Id. at 905.)

**III.  THE ADMINISTRATIVE HEARING**

The ALJ conducted an administrative hearing on April 30, 2012.  (Id. at 45.)

**A.    Plaintiff's Testimony**

Plaintiff testified that she previously worked at Denny's Restaurant as a waitress from 1988 to 2008 and as a manager from 2008 until November 2009.  (Id. at 48.)  For the past year, she had worked as a playground substitute at Alpine Union School District.  (Id. at 49.)  The amount of time she worked varied, but typically consisted of two hours per day, two to four days per month.  (Id.)

Plaintiff testified that due to Guillain-Barre Syndrome and inflammatory polyneuritis, if she walks, stands, or sits for too long, she

experiences pain in her feet, legs, arms, and fingers.  (Id. at 51.)  At its worst, she rates the pain at an 8 on a 1-10 scale.  (Id.)  Plaintiff stated that she can walk approximately two blocks before her legs start feeling shaky and she experiences pain and weakness.  (Id. at 52.)  She can stand for 45 minutes to an hour before she must sit down.  (Id. at 53-54.)  Additionally, both her arms and legs go temporarily numb throughout the day.  (Id. at 51.)

Plaintiff also reported issues involving her hands and fingers.  (Id. at 52.)  After approximately 5 minutes of typing her left hand goes numb.  (Id.)  After approximately 15 minutes of writing her right hand becomes fatigued.  (Id.)  She has difficulty opening jars and containers, and requires assistance.  (Id. at 53.)  The most she can lift is approximately 10 pounds.  (Id. at 54.)

Plaintiff had gamma globulin infusion treatments for Guillain-Barre Syndrome which were not helpful.  (Id.)  Plaintiff experienced side effects from the treatments, including severe headaches which limited her ability to concentrate or drive a vehicle.  (Id.)  Plaintiff now has low blood pressure, possibly because of Guillain-Barre Syndrome.  (Id. at 55.)  During one session of gamma globulin treatment, Plaintiff fainted as a result of her low blood pressure.  (Id. at 56.)  Plaintiff's symptoms were also treated with Prednisone with no effect.  (Id.)

Plaintiff sleeps only three or four hours per night due to pain in her legs.  (Id. at 54-55.)  Because she does not sleep well at night, she takes three to four naps per day, each approximately one hour long.  (Id. at 51, 55).  She has depression and anxiety.  (Id. at 54.)  Plaintiff testified she used to have a good memory, but now due to pain she forgets things and has difficulty concentrating.  (Id. at 55.)  She is currently prescribed Vicodin for pain management, which makes her "loopy" whenever she takes it.

(Id.)  She refuses to drive whenever she takes Vicodin, and generally only takes it at night.  (Id.)

Plaintiff quit smoking on January 2, 2012.  (Id. at 56-57.)  Plaintiff has asthma for which she has been prescribed an aero chamber and an inhaler for nighttime use.  (Id. at 58.)  A nocturnal oximetry test was performed to determine if she had sleep apnea.  (Id. at 59.)  The test discovered an unusual downward ramp of desaturation of oxygen suggesting hypoventilation.  (Id.)  Due to questions regarding the technical quality of the study, a repeat study was performed.  (Id.)

**B.  Vocational Expert Testimony**

Vocational expert ("VE") witness Bonnie SinClair testified at the administrative hearing.  (Id. at 59-63.)  She characterized Plaintiff's past work as a restaurant manager as light, skilled work, and as a waitress, light, semi-skilled work.  (Id. at 60.)  She testified that a person of the same age and education as Plaintiff, who was capable of lifting 25 pounds occasionally, 10 pounds frequently, who had no limitations sitting, pushing or pulling, whose standing would be restricted to level ground, who was limited to moderate climbing, balancing, stooping, kneeling, and crouching, who had moderately limited fingering, who had no limitation as to reaching and handling, who had no other limitations on communicative functions or vision, and no abnormalities or deficiencies as to mental status, could perform Plaintiff's past relevant work as a waitress.  (Id. at 60-61.)

The VE further testified that a person of the same age and education as Plaintiff, who was limited to lifting 10 pounds occasionally, 10 pounds frequently, who could stand and walk two out of eight hours a day, sit six hours out of eight, who was precluded from use of a ladder, rope, or scaffold, whose other posturals were occasionally limited, who had no manipulative limitations, and who would have to avoid moderate exposure

to hazards, machinery, and heights would not be able to perform Plaintiff's past work. (<u>Id.</u> at 61-62.)  The VE testified that such a person would be limited to work at the sedentary level, and would able to perform the jobs of document preparer or telephone clerk. (<u>Id.</u>)  These jobs could be performed by someone limited to standing for 30 to 45 minutes at a time or limited to sitting for 2 hours at a time. (<u>Id.</u> at 62.)  She testified that these jobs could not be performed by someone limited to lifting 5 pounds on an occasional basis, and no lifting on a frequent basis; nor could the jobs be performed by someone with occasional manipulative limitations. (<u>Id.</u> at 63.)

## IV.  THE ALJ DECISION

After considering the record, ALJ Parker made the following findings:

. . . .

2.    The claimant has not engaged in substantial gainful activity since November 4, 2009, the alleged onset date [citation omitted].

. . . .

3.    The claimant has the following severe impairments: Guillain-Barre syndrome, irritable bowel syndrome and myofascial pain [citations omitted].

. . . .

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in [the Social Security regulations].

. . . .

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry 25 pounds occasionally and 10 pounds frequently, is able to stand on level ground, and is able to climb, balance, stoop, crawl and crouch moderately and occasionally. Fingering is moderately and occasionally limited.

. . . .

6.    The claimant is capable of performing past relevant work as a waitress.  This work does not require the performance of work-related activities precluded by the

claimant's residual functional capacity [citation omitted].

. . . .

7.    The claimant has not been under a disability, as defined in the Social Security Act, from November 4, 2009, through the date of this decision [citation omitted].

(Id. at 30-36.)

## V. STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show that:  (1) He or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C. § 423(d)(1)(A), (2)(A).  An applicant must meet both requirements to be "disabled."  Id.  Further, the applicant bears the burden of proving that he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

## A.    Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled."  The five steps are as follows:  (1) Whether the claimant is presently working in any substantial gainful activity.  If so, the claimant is not disabled.  If not, the evaluation proceeds to step two.  (2) Whether the claimant's impairment is severe.  If not, the claimant is not disabled.  If so, the evaluation proceeds to step three.  (3) Whether the impairment meets or equals a specific impairment

listed in the Listing of Impairments.  If so, the claimant is disabled.  If not, the evaluation proceeds to step four.  (4) Whether the claimant is able to do any work he has done in the past.  If so, the claimant is not disabled.  If not, the evaluation continues to step five.  (5) Whether the claimant is able to do any other work.  If not, the claimant is disabled.  Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled.  20 C.F.R. § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

**B.     Judicial Review**

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C.A. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Commissioner's final decision should not be disturbed unless:  (1) The ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole.  Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion.  See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009) (citing Andrews, 53 F.3d at 1039).  Where the evidence is susceptible to more

than one rational interpretation, the ALJ's decision must be affirmed. Vasquez, 572 F.3d at 591 (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be remanded to the SSA for further proceedings.  Id.

## VI.  DISCUSSION

Plaintiff's contention that the ALJ's decision is the product of legal error rests on one ground:  that the ALJ failed to articulate specific and legitimate reasons for rejecting Plaintiff's treating physician's opinions. (Pl.'s Mem. at 2-8.)  To support her argument, Plaintiff characterizes the ALJ as having set forth two reasons for discounting Dr. Devor's opinions: First, that Dr. Devor's opinion that Plaintiff "remains disabled from further employment" was a legal conclusion, the determination of which is reserved for the Commissioner, and second, that Dr. Devor's opinions were not consistent with his treatment records.  (Id. at 3-4, 5.)  While at first glance it does appear the ALJ articulated only these two reasons for discounting Dr. Devor's opinion, a careful review of the ALJ's decision reveals a third reason:  "the record fails to support the doctor's opinion that the claimant is incapable of all work."  (See Admin. R. at 35.)  The Court addresses each of these three reasons in turn.

### A.   ALJ's first stated reason:  Dr. Devor rendered a legal conclusion on the ultimate issue of disability

On August 22, 2011, Plaintiff's treating neurologist, Dr. Devor, submitted a one-page medical statement form to the SSA regarding Plaintiff's physical abilities and limitations, which included a statement that Plaintiff "remains disabled from gainful employment."  (Id. at 697.)  Plaintiff argues the ALJ improperly discounted Dr. Devor's opinions on the basis

16

13cv1766

that this opinion was a legal conclusion on the ultimate issue of disability, reserved for the Commissioner.  (Pl.'s Mem. at 3-5.)

"In disability benefits cases . . . physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability—the claimant's ability to perform work."  Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998).  Greater weight is afforded to a treating physician's opinion because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual."  Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987).  However, the treating physician's opinion is not necessarily conclusive as to either a physical condition or the ultimate issue of disability.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted).  The ALJ may disregard the treating physician's opinion irrespective of whether that opinion is contradicted.  Id.  However, the fact that a treating physician rendered an opinion on the ultimate issue of disability does not relieve the ALJ of his obligation to articulate specific and legitimate reasons supported by substantial evidence in the record for rejecting it.  See Reddick, 157 F.3d at 725.

Plaintiff's argument that an ALJ may not reject a treating physician's opinion simply because it is an opinion on the ultimate issue of disability is valid.  See Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014).  As Plaintiff correctly observes, Social Security Ruling 96-5p instructs that "adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner."  SSR 96-5p, 1996 WL 374183, at *2.  The ALJ is "required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner."  Id. at *3.  Therefore,

the Court finds the ALJ's first reason for discounting Dr. Devor's opinion was not a legitimate ground for doing so.

Although the Court agrees with Plaintiff's argument to the extent stated above, the remainder of Plaintiff's arguments surrounding this issue are without merit.  Plaintiff contends the ALJ found the opinions of Dr. Devor were "sullied" by the inclusion of an opinion on the ultimate issue of disability and that the ALJ became "preoccupied" by Dr. Devor's statement. (Pl.'s Mem. at 4.)  The Court's review of the record, however, finds no support for these assertions.  The ALJ did not explicitly state nor did he imply that the inclusion of an opinion on the ultimate issue of disability tainted Dr. Devor's opinions.  Rather, the ALJ correctly stated that the determination of disability is an administrative finding based on legal standards, and is not a medical determination, and as such, is an issue reserved for the Commissioner.  (See Admin. R. at 35; Boardman v. Astrue, 286 Fed. Appx. 397, 399 (9th Cir. 2008)  ("[A] determination of a claimant's ultimate disability is reserved to the Commissioner, and . . . a physician's opinion on the matter is not entitled to special significance.") (citing 20 C.F.R. § 404.1527(e)); Ukolov v. Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005) ("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability.").)  The ALJ could correctly give "little weight" to Dr. Devor's statement that Plaintiff "remains disabled from further employment" so long as he evaluated all the evidence in the record bearing on disability.  See SSR 96-5p at *3.  The Court finds the ALJ fulfilled this requirement.  (See Admin. R. at 32-36 (ALJ's discussion of medical evidence in the record).)

Additionally, citing SSR 96-5p, Plaintiff argues the ALJ should have recontacted Dr. Devor for clarification of his opinion of disability.  (Pl.'s

Mem. at 4.)  While SSR 96-5p permits an ALJ to contact a treating physician for clarification of his opinion, it also makes clear that recontact is limited to those instances "when [treating physicians] provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear[.]"  SSR 96-5p at *2; see also Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) ("An ALJ is required to recontact a doctor only if the doctor's report is ambiguous or insufficient for the ALJ to make a disability determination.")  Nothing in the record indicates the ALJ was uncertain of the bases for Dr. Devor's opinion or otherwise found the record ambiguous or inadequate.  The Court is not persuaded there was any need for the ALJ to recontact Dr. Devor as Plaintiff contends.

**B.    ALJ's second stated reason:  Dr. Devor's opinion was inconsistent with his treatment records**

The ALJ also assigned little weight to Dr. Devor's disability opinion because the ALJ determined it was inconsistent with Dr. Devor's treatment records.  (Admin. R. at 35.)  The ALJ noted that Dr. Devor repeatedly described Plaintiff's condition as mild or moderate, not severe, contradicting his opinion that Plaintiff remains disabled from further employment.  (Id.)  Plaintiff contends that Dr. Devor's treatment records were not inconsistent with his opinion, and the ALJ erred by discounting Dr. Devor's opinion on this basis.  (Pl.'s Mem. at 5-8.)

A discrepancy between a doctor's opinion and his clinical notes constitutes a valid reason to not rely on the doctor's opinion.  Bayliss, 427 F.3d at 1216; see also Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (ALJ properly rejected physician's opinion where it was contradicted by treatment notes); Ghanim, 763 F.3d at 1161 (conflict between treatment notes and treatment provider's opinions constitutes a valid reason to discredit treating doctor's opinion).  An ALJ only gives controlling weight to

the opinion of a treating physician when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.  See 20 C.F.R. § 404.1527(c)(2); Ghanim, 763 F.3d at 1160.  "Where evidence is susceptible of more than one rational interpretation, it is the ALJ's conclusion which must be upheld.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982) (citing Rhinehart v. Finch, 438 F.2d 920, 921 (9th Cir. 1971)).  Here, as cited by the ALJ, the record contains numerous instances where Dr. Devor describes Plaintiff's condition as "mild" or "very mild." (See Admin. R at 256, 263, 266, 270, 273, 477, 482, 487, 511, 524, 771.)  Because these conflict with Dr. Devor's opinion that Plaintiff was incapable of performing any work, the ALJ, under the above-cited authorities, could permissibly discount Dr. Devor's opinion accordingly.

In discounting the opinion of Dr. Devor, Plaintiff argues that the ALJ ignored the results of Plaintiff's second nerve conduction study.  (Pl.'s Mem. at 5.)  While the study provided clinical evidence of inflammatory polyneuritis (see Admin. R. at 245), Dr. Devor continued to refer to the weakness in Plaintiff's extremities as either mild or moderate in nature even after the study (id. at 239, 426, 718, 771, 842, 898), and no interpretation of the nerve conduction study in the record supports that her condition is a disabling one.  Moreover, the ALJ did not question the diagnosis of Guillain-Barre Syndrome; rather, he determined that her condition, including her myalgia and other symptoms, does not render Plaintiff disabled.

Plaintiff further argues the ALJ ignored both abnormal neurological deficits on clinical examination as well as Dr. Devor's continued documentation that Plaintiff's symptoms had not improved and as a result Plaintiff was disabled.  To the contrary, the ALJ specifically cited the results

13cv1766

of Dr. Devor's repeated clinical examinations wherein Dr. Devor concluded her symptoms were either mild or moderate in degree.  (Id. at 33.)  The ALJ also noted the results of physical examinations performed in July, September, and October 2010 to determine the extent of Plaintiff's motor reflexes.  (Id. at 33-34.)  While Dr. Devor documented in each instance that there was no improvement in her symptoms, he also continued to characterize her deficits as either mild or weak.  (Id. at 239, 398, 426.)  The ALJ could properly find these findings contradicted Dr. Devor's opinion that Plaintiff was disabled from gainful employment.

The Court finds the ALJ's determination that Dr. Devor's opinion concerning Plaintiff's inability to work was inconsistent with his treatment notes was a specific and legitimate reason supported by substantial evidence in the record to discount Dr. Devor's opinions.

### C.     ALJ's third stated reason:  the record does not support Dr. Devor's opinion that Plaintiff is incapable of performing all work

An ALJ may discredit treating physicians' opinions that are unsupported by the record as whole.  See Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).  Additionally, "[i]f there is substantial evidence in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to controlling weight."  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (internal quotations omitted).  When an examining physician provides "independent clinical findings that differ from the findings of the treating physician," such findings are "substantial evidence."  Id.  The opinions of a non-treating or non-examining physician may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).

Here, the ALJ evaluated the evidence in the record and found that it did not support Dr. Devor's opinion that Plaintiff was disabled from gainful employment.  He considered and gave moderate weight to the opinion of Dr. Stover, the examining doctor, who found Plaintiff capable of standing and walking 6 out of 8 hours and lifting and carrying 25 pounds occasionally and 10 pounds frequently.  (Admin. R. at 35.)  The ALJ considered and assigned moderate weight to the non-examining state agency medical consultant's opinion that Plaintiff could lift and carry 10 pounds occasionally and 10 pounds frequently, and could stand and walk for 2 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday.  (Id. at 35-36.)  Each of these opinions constitutes "substantial evidence" which weighed against Dr. Devor's determination that Plaintiff was incapable of work.  See, e.g., Orn, 495 F.3d at 632; Thomas, 278 F.3d at 957.  The ALJ conducted a thorough review of the record and set forth his analysis of the evidence (see id. at 33-36) and could properly find that Dr. Devor's opinions were not supported by substantial evidence in the record.  See Thomas, 278 F.3d at 957 (ALJ can meet the burden of rejecting the opinion of a treating physician "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings").

In sum, the Court concludes that the second and third reasons articulated by the ALJ were sufficiently specific and legitimate to discount Dr. Devor's opinions,.

## VII.  CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment should be **DENIED** and Defendant's cross-motion for summary judgment should be **GRANTED**.

This report and recommendation will be submitted to the Honorable

Cynthia A. Bashant, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court and serve a copy on all parties on or before **January 30, 2015.** The document should be captioned "Objections to Report and Recommendation."  Any reply to the Objections shall be served and filed on or before **February 13, 2015**.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  January 12, 2015

Jan M. Adler
U.S. Magistrate Judge

13cv1766